IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ESTES SMITH                          :        CIVIL ACTION
                                     :
              v.                     :
                                     :
PATRICK R. DONAHOE,                  :        NO.  12-2639
Postmaster General

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                           September 30, 2013

In this employment action, Plaintiff claims that he was discriminated against on

the basis of his disability and in retaliation for complaints of discrimination he made to

the Equal Employment Opportunity Commission ("EEOC") and postal supervisory

personnel.  Presently pending are Defendant's motion for summary judgment on all of the

remaining claims and Plaintiff's motion for partial summary judgment on his claim that

Defendant failed to provide a reasonable accommodation.  For the reasons that follow, I

will grant Defendant's motion with respect to the reasonable accommodation theory of

disability discrimination and deny Defendant's motion in all other respects, and I will

deny Plaintiff's motion.

## I.    FACTS AND PROCEDURAL HISTORY

Plaintiff has been a postal employee since 1984 and became a mail carrier in 1985.

Smith Dep. at 13.[1]  In March of 1992, Plaintiff was diagnosed with left shoulder brachial

_____

[1]Because some of the depositions or excerpts of the depositions are attached to
multiple pleadings, rather than referring to a deposition transcript by exhibit number, I
have identified each by deponent.

plexitis, a condition affecting an area of the collarbone where the nerves come out of the neck and go down the arm.  See id. at 38; Cohen Dep. at 13.  According to Plaintiff, his condition affected his ability to carry a heavy mail bag on his left shoulder and his ability to "case" mail because he has difficulty with grasping with his left hand.  See Smith Dep. at 136-38.[2]

In September 2000, Michael Martin Cohen, M.D., Plaintiff's treating physician, wrote a letter to Plaintiff's employer requesting that he be assigned to a position which did not require lifting or carrying.  See Smith Dep. at 65.  On November 4, 2000, Plaintiff began a "rehabilitation job," which included modification of his regular job duties as a result of the left brachial plexitis.  See id. at 66-68.[3]  Smith was offered and accepted a rehabilitation position with the following duties:  (1) collecting mail from street mailboxes and returning it to the North Philadelphia station, (2) delivering Express Mail packages, (3) delivering parcels, and (4) dropping off large quantities of mail to large organizations.  See id. at 67-71.  Smith's job duties remained the same until 2009.

Janet Felix became the manager of the North Philadelphia station in October of 2008.  See Felix Dep. at 10-11.  Ms. Felix knew when she became manager that Mr.

---

[2]Casing mail involves sorting mail for delivery.  For a right-handed carrier like Smith, this involves gripping the mail with the left hand and pushing it with the thumb. See Smith Dep. at 87.

[3]A mail carrier is designated a "rehabilitation carrier" when he is injured on the job and has been determined by medical personnel to have permanent restrictions which have reached maximum medical improvement.  See Butts Dep. at 18.  In contrast, a "limited-duty carrier" has on-the-job injuries that limit his or her abilities, and a "light-duty carrier" has a non-job-related injury or condition that limits his or her abilities.  See id. at 18.

Smith was a rehabilitation carrier and had a shoulder condition.  <u>See</u> Smith Dep. at 142-44.  In March of 2009, Felix issued Mr. Smith a letter of warning regarding a police citation he received.  Although Mr. Smith had the citation removed by a police sergeant, Ms. Felix did not remove the letter of warning in Mr. Smith's file.  <u>See</u> <u>id.</u> at 158-61, 166-68.  Mr. Smith sought pre-complaint counseling with an EEO counselor on May 18, 2009.  <u>See</u> <u>id.</u> at 190-91; Doc. 46-2 Exh. F (5/18/09 Information for Pre-Complaint Counseling).  Although Ms. Felix denies that she had knowledge of Mr. Smith's pre-complaint counseling in May and June 2009, <u>see</u> Doc. 40 Exh. 12 (Felix declaration) ¶¶ 31-32, Plaintiff maintains that Ms. Felix would have been notified of the pre-complaint counseling with the EEO.  <u>See</u> Doc. 46-1 at 10; Kulikowski Dep. at 22.  Smith sent a letter to James Gallagher, a district manager, dated May 20, 2009, complaining about Ms. Felix's management style.  <u>See</u> Smith Dep. at 194-95.  Smith wrote another letter complaining of Felix's management style, discrimination, and prior discipline for the police citation on May 26, 2009, and sent it to the Postmaster.  <u>See</u> <u>id.</u> at 198-200; Doc. 40 Exh. 21 (5/26/09 letter).  Felix denies that she had any knowledge of these letters.  <u>See</u> Doc. 40 Exh. 12 ¶ 33.

On May 27, 2009, at the conclusion of Smith's shift, a co-worker told Smith that she believed someone was hiding mail in a back room of the North Philadelphia station.  <u>See</u> Smith Dep. at 224-27.  When Smith checked, he found two tubs of mail.  <u>See</u> <u>id.</u> at 234-35.  Believing that the supervisor on duty at the North Philadelphia station would not do anything about the mail, Smith tried to contact Maureen McKenna, the area manager, and Kevin McAdams, the Philadelphia Postmaster, but failed to reach either.  <u>See</u> <u>id.</u> at

229-32.  He contacted other supervisors he trusted, including Kevin Mahoner, and told

Mr. Mahoner that he was going to bring the mail to the Lindbergh Station.  See id. at 231.

Smith put the tubs of mail in the trunk of his personal car, drove to the Lindbergh Station,

and turned the mail over to Howard Gertler.  See id. at 235-36.

Ms. Felix learned about the transfer of the mail later in that evening, and called the

supervisors of the North Philadelphia station to determine what had happened.  See Felix

Dep. at 37-39.  One of the supervisors, Sara Davis-White, admitted that she had placed

the mail there waiting for a limited-duty carrier to return so it could be delivered.  See id.

at 38.[4]

The following day, Ms. Felix placed Mr. Smith on emergency off-duty status

("suspension") pending the results of an investigation.  See Felix Dep. at 76-77; Doc. 40

Exh. 28 (6/3/09 letter).  Smith remained on suspension without pay for three days, May

29 through June 2, 2009.  See Smith Dep. at 246, 258-59.  Smith grieved the discipline

while he was on suspension and the union negotiated an agreement providing for Smith's

return after June 2, 2009, and ultimately only two of the three days were without pay.

See Felix Dep. at 83-85; Zebin Dep. at 51-52.

Philadelphia Postmaster McAdams first learned of Smith when he was told about

the incident on May 28, 2009.  See Doc 40 Exh. 14 (McAdams declaration) ¶ 5.

McAdams explains that he was concerned about having a carrier who had demonstrated

what he considered to be exceedingly poor judgment performing a critical postal task,

---

[4]As a result of this incident, Ms. Davis-White was issued a notice of removal -- a
notice that she was tentatively going to be fired.  She grieved the discipline and reached a
settlement that included a demotion.  See Felix Dep. at 54.

and that he was the first person to propose that Mr. Smith's duties be changed so that he was no longer performing collections and could be supervised more closely. See id. ¶ 18. Upon his return to work, supervisor Felix met with Smith and presented him with an Offer of Modified Assignment Form 2499. See Smith Dep. at 259-60; Felix Dep. at 85-86; Doc. 40 Exh. 31 (6/5/09 Offer of Modified Assignment).[5] The job described in the June 5, 2009 Offer of Modified Assignment differed from Smith's prior duties in three ways: (1) he would no longer be asked to perform collections or drop offs, (2) he would be asked to "case" mail up to one hour per day, (3) his scheduled days off were changed from Saturday/Sunday to Sunday/rotating, and (4) his shift was adjusted from 9:30 a.m. - 6:00 p.m. to 10:00 a.m. - 6:30 p.m. See Smith Dep. at 107, 263-65; Doc. 40 Exh. 9 (8/30/06 Offer of Modified Assignment). The only duty on the June 5, 2009 Offer of Modified Assignment that Mr. Smith believes was outside of his physical limitations was casing mail up to one hour per day, which required grasping and fine manipulation with his left hand. See Smith Dep. at 268. According to Mr. Smith's CA-17's[6] dated February 21, 2008 and April 30, 2008, he was not permitted to engage in any fine manipulation and simple grasping, as was required for casing mail. See Doc. 40 Exh. 30 (2/21/08 & 4/30/08 CA-17's). Ms. Felix states that she was unaware of those CA-17's

---

[5]The Offer of Modified Assignment was signed by Felix on June 4, 2009, and by Smith on June 5, 2009.

[6]The parameters of a rehabilitation carrier's work capabilities are defined on a Form CA-17 "Duty Status Report," on which the Postal Service first inputs the normal physical demands of the employee's position. A physician then denotes the reduced physical demands that the employee can tolerate in light of his or her physical condition. The employee submits the CA-17. See Smith Dep at 55-58.

and instead relied on a prior CA-17 dated May 17, 2007, which permitted Mr. Smith to engage in fine manipulation and simple grasping required for casing mail. See Doc. 40 Exhs. 11 (5/17/07 CA-17) & 12 ¶¶ 18-21.

During the meeting in which Ms. Felix reviewed the Offer of Modified Assignment with Mr. Smith, he expressed concern over his ability to case mail. See Smith Dep. at 260-61. She advised him to submit updated medical documentation. See id. at 260-61, 262-263; Felix Dep. at 108-09, 110-11. Smith maintains that Felix told him that if he did not sign the paper and accept the modified job offer, he would have to go home and collect Workers' Compensation. See Smith Dep. at 262. Ms. Felix states that she told Mr. Smith he would not be permitted to work if he refused the Offer of Modified Assignment, but that he could provide updated medical documentation showing that the duties exceeded his limitations. See Doc. 40 Exh. 12 ¶¶ 24-24.

Mr. Smith signed the Offer of Modified Assignment on June 5, 2009, and returned to work that day. See Smith Dep. at 260-61, 277. He thereafter sought treatment for an emotional breakdown and did not return to work again until middle or late 2010. See id. at 278-83; Doc. 40 Exh. 12 ¶ 26. Mr. Smith maintains that at some point he attempted to rescind his June 5, 2009 acceptance of the Offer of Modified Assignment by writing "wish to rescind and be made whole to previous form 50" on the Offer and faxing it to the Department of Labor. See id. at 271-73; Doc. 40 Exh. 32.[7]

---

[7]According to Smith, Form 50 is a personnel form that contains a rehabilitation employee's job description. See Smith Dep. at 164.

Mr. Smith saw his physician on June 9, 2009, and obtained an updated CA-17 Duty Status Report stating that he was not physically able to case mail.  See Smith Dep. at 276-77; Cohen Dep. at 53-55; Doc. 40 Exh. 33.  When Mr. Smith returned to work, he was given a job offer that did not include casing mail.  See Smith Dep. at 282-83; Doc. 40 Exh. 12 ¶ 28.

On August 27, 2009, Mr. Smith filed an EEO complaint, alleging discrimination on the basis of sex, age, disability, and retaliation.  See Doc. 40 Exh. 34.  On March 15, 2012, Mr. Smith received a final agency decision granting him the right to file a civil action.  See Doc. 40 Exh. 36.  Plaintiff filed his complaint in federal court on May 15, 2012, and an amended complaint on October 17, 2012.  See Docs. 1 & 12.

On August 26, 2013, Plaintiff filed a motion for partial summary judgment, seeking judgment in his favor on a failure to accommodate claim.  See Doc. 42.  On the same day, Defendant filed a motion for summary judgment challenging Plaintiff's failure to accommodate, disparate treatment and retaliation claims.  See Doc. 39.  Both sides have filed responses and replies.  See Docs. 45 & 46, 50 & 51.

## II.  LEGAL STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the adverse party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp.2d 402, 408 (E.D. Pa. 2000).

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

## III. DISCUSSION

### A. Administrative Exhaustion

In the Amended Complaint, Plaintiff brought claims of disability discrimination and retaliation. See Doc. 12 Counts II and III.[8] In his memorandum in opposition to

---

[8]Plaintiff withdrew the due process claim contained in Count I of the Amended Complaint. See Doc. 19 at 2 n.1, 16.

Defendant's summary judgment motion, Plaintiff states that he is alleging (1) that Defendant failed to accommodate his disability and modified his duties outside of his physical limitations, (2) disparate treatment on the basis of his disability, and (3) retaliation. See Doc. 46 at 2.[9]  All of Plaintiff's claims arise under the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability or in retaliation for protected activity. 29 U.S.C. §§ 791, 794.  The Rehabilitation Act, like Title VII, has an administrative exhaustion requirement. Spence v. Straw, 54 F.3d 196, 200 (3d Cir. 1995) (citing McGuinness v. U. S. Postal Serv., 744 F.2d 1318, 1320 (7th Cir. 1984)).  "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996).  Defendant first argues that Plaintiff failed to administratively exhaust certain of his claims.[10]

In determining whether a claim has been administratively exhausted, the court is not limited to the four corners of the EEO complaint.  Rather, claims are considered administratively exhausted if the claims were "fairly within the scope of the . . . EEOC complaint, or the investigation arising therefrom." Kovoor v. School Dist. of Phila., 211 F. Supp.2d 614, 620 (E.D. Pa. 2002) (quoting Antol, 82 F.3d at 1295; Walters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)); see also Mandel v. M&Q Packaging Corp., 706 F.3d

_____

[9]All pinpoint citations to documents filed in the court's electronic case filing system refer to the ECF pagination.

[10]Defendant acknowledges that he previously presented the exhaustion argument in a motion to dismiss, which was rejected, but contends that Plaintiff has expanded his case in discovery, and that discovery has further revealed that Plaintiff failed to administratively exhaust his claims. See Doc. 40 at 14.

157, 163 (3d Cir. 2013) ("parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").

### a. Modified Job Offer

Defendant continues to argue that the claims arising from the June 5 Offer of Modified Assignment were not administratively exhausted because Plaintiff pursued only the letter of warning (arising from the police citation) and suspension in the EEOC. See Doc. 40 at 16. Such a narrow construction of Plaintiff's EEO complaint is inconsistent with Plaintiff's notation in the EEO complaint that the discrimination took place from March 16 through "the present" (August 27, 2009). See Doc. 40 Exh. 34. Because the suspension ended on June 2, 2009, the notation served to exhaust the discrimination claim through the time of the modified job offer a few days later.[11]

Defendant, relying on the Third Circuit's decision in Barzanty v. Verizon Pa., Inc., 361 Fed. Appx. 411, 415 (3d Cir. 2010), argues that when the EEOC complaint and investigation focus on a particular claim, the employee may not add a different claim to his federal complaint. In Barzanty, the Circuit Court found that the plaintiff had not exhausted claims that she was subjected to a hostile work environment when her EEOC charge focused on a gender discrimination charge related to her termination. The court found that Barzanty's claims related to separate occurrences -- one a discrete act of

---

[11]This point serves to distinguish one of the cases upon which Defendant relies. In Hodge v. Trinity Industries, Inc., one of the key factors leading to the conclusion that the plaintiff had not exhausted his additional discrimination claims was that the actions the plaintiff complained of took place beyond the dates alleged in the EEOC complaint. Civ. No. 10-1219, 2001 WL 36291862, at *4 (W.D. Pa. Feb. 7, 2001).

termination and the other "continuing occurrences unrelated to her discharge." 361 Fed. Appx. at 414. In contrast, in this case both actions -- Plaintiff's suspension and the modification of his job duties -- were related to his alleged unauthorized transport of mail. <u>See</u> Felix Dep. at 89; Doc. 40 Exh. 12 at ¶¶ 16-17.

Moreover, the actions occurred within a few days of each other. Courts have found claims exhausted that were not specifically mentioned in the EEOC charge "where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." <u>Howze v. Jones & Laughlin Steel Corp.</u>, 750 F.2d 1208, 1212 (3d Cir. 1984). Here, when Plaintiff returned from suspension, his supervisor presented him the modified job offer. Additionally, Plaintiff included the modified job duties in his EEO Investigative Affidavit as a basis for his complaint. <u>See</u> Doc. 46-2 at 79, 82. Finally, in its investigation, the EEOC reviewed the June 5 modified job offer and the copy of that form on which Plaintiff handwrote "wish to rescind." <u>See</u> Doc. 40 Exh. 36 at 12-13. For all of these reasons, I conclude that Plaintiff exhausted disability discrimination and retaliation claims related to the modified job offer.

b. <u>Failure to Provide a Reasonable Accommodation</u>

Defendant next argues that Plaintiff failed to exhaust his claim for failure to provide a reasonable accommodation. A prima facie claim for failure to provide a reasonable accommodation requires an employee to prove (1) he was disabled and the employer knew it, (2) he requested an accommodation or assistance, (3) his employer did not make a good faith effort to assist, and (4) he could have been reasonably accommodated. <u>Brunson v. Peake</u>, Civ. No. 08-2827, 2011 WL 3715084, at *6 (E.D. Pa.

Aug. 24, 2011) (quoting <u>Armstrong v. Burdette Tomlin Mem. Hosp.</u>, 428 F.3d 240, 246 (3d Cir. 2006)).[12]  In contrast to his claim respecting the modified job offer, I conclude that he failed to exhaust his failure to accommodate claim.

Plaintiff's EEOC complaint does not mention a failure to accommodate.  <u>See</u> Doc. 40 Exh. 34.  The complaint alleges that Ms. Felix expressed her dislike of "rehabs" in connection with writing Plaintiff up for a ticket.  The EEOC's focus in its investigation was a disparate treatment claim based on disability.  In its final 27-page decision, the only mention of an accommodation was in the background section of the opinion, which states,

> In response to the question as to whether he had requested accommodations for his medical condition the complainant responded "not at this time;" and in parenthesis [sic] "yes, because of this condition. No."  the complainant indicated that he had previously been accommodated when he was allowed to use a mail cart but set forth that management had changed his job.

Doc. 40 Exh. 36 at 11; <u>see also</u> Doc. 46-2 at 75 (EEO Investigative Affidavit).

The EEOC's decision does not mention the essential elements of a reasonable accommodation claim.  It does not indicate whether Plaintiff sought an accommodation when he was given the modified duty assignment, and, if so, what accommodation, whether it was reasonable, and what response he received, or any indication that the

---

[12]Defendant also addresses the merits of Plaintiff's accommodation claim, arguing that if Plaintiff was unable to deliver and case mail, he may not be qualified to be a mail carrier because these are essential functions of the job.  <u>See</u> Doc. 39 at 25 n.13.  This is an issue of disputed fact.

parties participated in the interactive process. These facts are essential to any discussion of a reasonable accommodation claim.

I am mindful that EEOC complaints must be construed broadly and that the court should look to see whether the claim is "fairly within the scope of the . . . EEOC complaint, or the investigation arising therefrom." <u>Kovoor</u>, 211 F. Supp.2d at 620. However, even broadly construed, the record pertaining to the EEOC claim does not support the conclusion that Plaintiff exhausted the failure to accommodate claim. Therefore, I will grant Defendant's motion with respect to the failure to accommodate claim and deny Plaintiff's motion for judgment in his favor on the failure to accommodate claim.[13]

### B.  <u>Disability Discrimination - Disparate Treatment</u>

In considering claims of disability discrimination under the Rehabilitation Act, the court applies the burden-shifting framework adopted in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 793-94 (1973). <u>Wishkin v. Potter</u>, 476 F.3d 180, 184-85 (3d Cir. 2007).  Under this paradigm, the plaintiff has the initial burden to make a prima facie showing of discrimination.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  <u>Id.</u> at 185 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  If the employer meets its burden, the plaintiff is

---

[13]Defendant also argues that the reasonable accommodation claim is not pled in the Amended Complaint.  <u>See</u> Doc. 45 at 18.  Because I find that the claim was not administratively exhausted, I need not address whether it was properly pled in the Amended Complaint.

given an opportunity to show that the stated reason for the employment action is merely a pretext for discrimination. Id. (citing McDonnell Douglas, 411 U.S. at 804).

In seeking judgment on Plaintiff's disparate treatment claim, Defendant argues that Plaintiff has failed to establish a prima facie case of disability discrimination, which requires Plaintiff to establish that (1) he has a disability, (2) that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) that he was nonetheless terminated or otherwise prevented from performing the job. Wishkin, 476 F.3d at 184.

       1.    Disability

Defendant first argues that Plaintiff is not disabled within the meaning of the statute. See Doc. 46 at 19-21, 25-24. The Rehabilitation Act defines "an individual with a disability" as someone who (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 29 U.S.C. § 705(9) (referring to definitions in 42 U.S.C. § 12102(1)). Major life activities include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2). "Congress has directed that the term 'substantially limits' be 'construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the [Americans with Disabilities Act]." Bush v. Donahoe, ___ F. Supp.2d. ___, 2013 WL 4045785, at *11 (W.D. Pa. Aug. 8, 2013) (quoting 29 C.F.R.

§ 1630.2(j)(1)(ii) & (iii) (2012)).  Thus, the test is whether, "at the time of the adverse employment action, the limitation caused by the impairment was "substantial."  <u>Id.</u> (citing <u>Koller v. Riley Riber Hollin & Colagreco</u>, 850 F. Supp.2d 502, 513 (E.D. Pa. 2012)).

Based on the deposition testimony and the exhibits attached to the summary judgment briefing, I conclude that there are genuine issues of fact regarding Plaintiff's abilities.  Defendant focuses on the activities which Plaintiff can perform, including scuba diving.  <u>See</u> Doc. 39 at 22.  However, the evidence is unclear regarding the effects Plaintiff's shoulder impairment has on his abilities, specifically how the limitations on his fine manipulation affect his daily life.  Plaintiff testified that his shoulder injury sometimes interfered with his sleeping, but that it did not prevent him from taking care of himself or performing "other" manual tasks around the house.  <u>See</u> Smith Dep. at 138-40.[14]  He also stated that he had difficulty bearing weight on his left shoulder and grasping things with his left hand.  <u>See</u> <u>id.</u> at 137-38.  In a later-filed affidavit, Plaintiff explained that his injury prevents him from performing activities requiring fine manipulation, like playing the piano, and manual tasks like simple grasping, reaching above the shoulder, and carrying heavy objects frequently.  <u>See</u> Doc. 46-2 (Smith affidavit) ¶¶ 11-12.  Dr. Cohen also noted grasping limitations and fine manipulation

---

[14]In context, it is unclear if Mr. Smith believed that he was being asked about other tasks around the house that did not involve grasping things with the left hand and carrying large weight on his shoulder.  Counsel had just finished asking him about the limitations his shoulder impairment caused him at work and defense counsel and Plaintiff had been focusing on his difficulty carrying weight on the shoulder and grasping things with the left hand.  <u>See</u> Smith Dep. at 136-38.

limitations.  <u>See</u> Cohen Dep. at 53, 55.  This is consistent with the 2008 CA-17 forms indicating that Plaintiff experienced pain and weakness due to his left brachial plexitis and that he should not cradle mail or hold mail with his left arm.  <u>See</u> Doc. 40 Exh. 30.[15] Plaintiff's son stated that his father's piano playing had diminished significantly.  <u>See</u> Deron Smith Dep. at 27-28.[16]  The ability to perform manual tasks is one of the identified major life activities under the Act, and the record raises genuine issues of material fact regarding the extent of the limitations Plaintiff's shoulder impairment imposed on his ability to perform manual tasks.[17]

2.    <u>Adverse Employment Action</u>

Defendant also contends that Plaintiff cannot establish that he was subjected to any adverse employment action.  <u>See</u> Doc. 39 at 27.  Both sides seem to agree that a minor modification of job duties does not necessarily constitute an adverse employment action.  <u>See</u> Doc. 39 at 27-28; Doc. 46 at 20.  That position is consistent with the law. <u>See</u> <u>Mondzelewski v. Pathmark Stores, Inc.</u>, 162 F.3d 778, 787 (3d Cir. 1998) ("minor or trivial actions that merely make an employee unhappy are not sufficient").  Defendant argues that the minor modifications to Plaintiff's job -- including changes to his days off,

---

[15]Although Plaintiff's classification as a rehabilitation carrier does not establish that he was disabled, the limitations that doctors placed on Plaintiff's work capabilities are relevant to such a determination.

[16]Based on Deron Smith's timeline, it is unclear whether Plaintiff's diminished piano playing was attributable to his shoulder or his subsequent mental impairment.

[17]In his summary judgment motion, Defendant argued that Plaintiff was not "regarded as" disabled.  Plaintiff offered no argument in response to this.

a later start and finish time, the deletion of collections duties, and the addition of casing duties -- do not constitute adverse employment actions. According to Defendant, these changes were akin to a lateral transfer with the same job title, pay, and significantly similar job duties. Plaintiff concedes that an able-bodied mail carrier might consider casing mail a slight modification in job duties. See Doc. 46 at 20. However, with Ms. Felix's addition of casing mail, an activity which Dr. Cohen had indicated was beyond Plaintiff's abilities, Plaintiff argues that the job modification was, in fact, punitive. See Doc. 46 at 20.[18]

The characterization of a job change as a lateral transfer does not without more decide the question of whether an employee has suffered an adverse employment action.

> When a plaintiff alleges that a lateral transfer constituted a materially adverse employment action, that plaintiff does not show actionable injury 'unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of employment . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state and injury.

Funayama v. Nichia Am. Corp., Civ. No. 08-5599, 2011 WL 1399844, at *16 (E.D. Pa. Apr. 13, 2011). In this case, the specific question is not whether the addition of mail casing duties would constitute an adverse employment action for a generic mail carrier,

---

[18]Defendant seems to question whether Plaintiff is actually unable to case mail. See Doc. 39 at 22-23. However, in light of Dr. Cohen's deposition testimony that Plaintiff could not case mail, see Cohen Dep. at 53-55, and Plaintiff's deposition testimony regarding a single incident where he had cased mail since the imposition of his limitations, see Smith Dep. at 92-93, there is at least a genuine issue as to Plaintiff's ability to case mail.

but whether it would do so for this plaintiff. Here, the reassignment of a duty that Plaintiff had been precluded by his physician from performing constituted more than a mere matter of Plaintiff's personal preference. Under the circumstances, Plaintiff has raised a genuine issue of material fact as to this prong of his discrimination claim as well.[19]

### 3. Causation

Defendant next argues that Plaintiff has failed to show that there was a causal link between the allegedly adverse employment action and his disability. In response to the summary judgment motion, it appears Plaintiff is proceeding on a mixed-motive theory of discrimination, which requires Plaintiff to show that the impermissible factor -- his disability -- was a motivating factor in the allegedly adverse employment action. See Doc. 46 at 21; see also Solomon v. School Dist. of Phila., 882 F. Supp.2d 766, 777 (E.D. Pa. 2012) (citing Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 214-15 (3d Cir. 2000)).[20]

---

[19]Moreover, based on Plaintiff's deposition testimony that it took him longer to case mail due to his impairment, the reassignment of this duty could have adverse consequences on his employment in the long term. See Smith Dep. at 92-93.

[20]A plaintiff can state a claim for discrimination or retaliation under either a pretext or mixed-motive theory of liability. A pretext case requires a plaintiff to establish that the impermissible motive was a determinative factor in the adverse employment action. Watson, 207 F.3d at 215. Under the mixed-motive theory, the plaintiff may show that the employment decision was based on both legitimate and illegitimate reasons and the illegitimate reason was a motivating factor in the decision. Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)). Although it continues to be unclear which of the two theories Plaintiff is pursuing, it appears that his response to Defendant's summary judgment motion is geared to the mixed-motive analysis. As will be discussed later in this memorandum, Defendant's

In his EEO complaint, Plaintiff stated that he had been warned by a co-worker that Ms. Felix had a resentment and hostility toward those with disabilities. See Doc. 40 Exh. 34. While such hearsay evidence may not itself be admissible at trial, Plaintiff relies on testimony of co-workers Hector Torres and Kim Marshall to establish evidence of animus. Ms. Marshall testified that she overheard Ms. Felix tell another worker that she did not like rehabilitation carriers, light-duty carriers, or limited-duty carriers, that she did not like people using carts on light duty, and that she preferred them to carry the mail with the bags. Marshall Dep. at 34-35. Mr. Torres testified that he felt like he always had a "bullseye on [his] back" around Ms. Felix because he was a limited-duty carrier. Torres Dep. at 37. He believed he was treated better by Ms. Felix than Plaintiff or Sheila Irving, a worker who had suffered a shoulder injury, because he could continue to case mail, despite his injury. Id.

Combined with one of the adverse employment actions alleged in this case -- inclusion of an activity precluded by Plaintiff's medical condition -- and viewed in the light most favorable to the Plaintiff, the evidence is sufficient to support a finding that Plaintiff's shoulder impairment was a motivating factor in the adverse employment action.

Having considered the prima facie case of disability discrimination, I will proceed to address the prima facie case of retaliation before addressing the employer's proffered reason for its actions.

---

retaliation argument is directed to the pretext theory, suggesting Defendant is under the impression that Plaintiff was proceeding on a pretext basis for that claim.

### C.    **Retaliation**

Like disability discrimination, an allegation of retaliation is also governed by the

McDonnell Douglas burden-shifting paradigm.  In order to establish a prima facie case of

retaliation, Plaintiff must show that (1) he engaged in protected EEO activity, (2) he was

subjected to an adverse employment action, and (3) there was a causal connection

between the protected activity and the adverse employment action.  Moore v. City of

Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (citing Nelson v. Upsala Coll., 51 F.3d

383, 386 (3d Cir. 1995)).  Defendant concedes that Plaintiff engaged in protected activity,

noting that Plaintiff sought EEO counseling on May 18, 2009, but contends that Plaintiff

cannot meet his burden with respect to the other two elements.  See Doc. 39 at 31.[21]

### 1.    Adverse Employment Action

In determining whether an employment action was adverse for purposes of a

retaliation claim, I must determine whether the action is one that would have "dissuaded

a reasonable worker from making or supporting a charge of discrimination."  Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales,

438 F.3d 1211, 1219 (D.C. Cir. 2006)).  An action that makes it difficult or impossible to

do one's job can fall into this category.  See, e.g., Durham Life Ins. Co. v. Evans, 166

F.3d 139, 153 (3d Cir. 1999) (having client files taken from insurance salesperson

---

[21]In response to the summary judgment motion, Plaintiff argues that his letter to the Postmaster on May 26, 2009, in which he complained about the disciplinary action based on his job status, race, and age, also qualified as protected activity.  I agree that this letter also constituted protected activity because Plaintiff was opposing perceived discrimination.  See Moore, 461 F.3d 331, 341 (3d Cir. 2006) (protected activity includes participating in Title VII proceedings and opposing discrimination).

constituted adverse employment action when files were vital to employee's ability to perform job).

As previously discussed, Plaintiff contends that the change in job duties to include an activity which he was medically precluded from performing constitutes an adverse employment action. Although there is some variance in the evidence concerning Plaintiff's ability to case mail, I have concluded above that, construed in the light most favorable to Plaintiff, the inclusion of casing mail in his job duties was adverse. This conclusion applies equally to Plaintiff's retaliation claim.

Defendant also argues that a reasonable employee would not view the modified job offer as adverse because the job modification was not final and Plaintiff could have rejected the offer and sought the involvement of the Department of Labor. See Doc. 39 at 32-33. At this point, there is disagreement about what Ms. Felix told Plaintiff at the time she presented him the job modification. See Smith Dep. at 262 (Felix told him he would have to go on Workers' Compensation if he did not accept the offer); Doc. 40 Exh. 12 ¶¶ 24-24 (Felix said he could present updated medical information). Therefore, Plaintiff has raised a genuine issue of material fact on this point.

### 2. Causation

Defendant also argues that Plaintiff has failed to show any causal connection between his EEO activity and the alleged adverse action. See Doc. 39 at 33-34. Specifically, Defendant argues that Plaintiff has failed to prove that the decision-makers were aware of Plaintiff's protected activity. Defendant contends that the facts are uncontested that Ms. Felix, Ms. McKenna, and Mr. McAdams did not learn that Smith

met with an EEO counselor in 2009. See Doc. 40 Exhs. 12 ¶¶ 31-32; 13 ¶¶ 21-22; 14 ¶ 20. Plaintiff contends that he waived his right to anonymity in the informal complaint process, see Doc. 46-2 at 6 ¶ 45 & Exh. F, and argues that therefore Ms. Felix would have been notified of his EEO activity. See Doc. 46 at 25.

Looking at the deposition of Michael Kulikowski, who was deposed regarding the EEO policies of the post office, it is unclear whether Ms. Felix would have been notified at that pre-complaint counseling stage. Mr. Kulikowski stated that the EEO counselor, Bill Batchellar, would contact the individuals involved when the complaint reached a level of redress. See Kulikowski Dep. at 22. It is unclear whether Mr. Smith's informal complaint had reached that level prior to his suspension. Ms. Felix disputes that it had, as she stated that she did not have knowledge of Mr. Smith's complaint. Doc. 40 Exh. 12 ¶¶ 31-32. However, viewed in the light most favorable to Plaintiff, there is sufficient evidence to question Ms. Felix's knowledge of Mr. Smith's complaints of discrimination.

In addition to the pre-complaint counseling with the EEO counselor, Plaintiff also sent a letter to Postmaster McAdams, dated May 26, 2009, in which Plaintiff complained of Ms. Felix's actions and referenced discrimination. "She is [a] discriminator trying to find a way to terminate my job because of my age, race and job status." Doc. 40 Exh. 21. Although Mr. McAdams did not recall seeing this letter and stated that he would not have been able to identify the signature as Mr. Smith's, Doc. 40 Exh. 14 ¶¶ 25-27, this

evidence is sufficient to raise a genuine issue of material fact regarding knowledge of Mr. Smith's complaints of discrimination.[22]

In this case the temporal proximity of Plaintiff's complaints of discrimination and his suspension and change in job duties is suggestive of a retaliatory motive, as Defendant concedes. See Doc. 39 at 34; compare Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (discharge two days after notice of EEOC claim was sufficient) with Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1999) (nineteen months too attenuated to create a genuine issue of fact based on timing alone). Six weeks after initiating an informal EEOC investigation, and less than two weeks after writing a letter to the Postmaster complaining of discrimination, Plaintiff was given the emergency leave for transporting mail to another station. Upon his return three days later, his job duties were modified at the suggestion of Postmaster McAdams. See Doc. 40 Exh. 14 ¶ 18. These events are sufficiently close in time to raise an inference of retaliation.

Defendant argues that Plaintiff's wrongful conduct immediately before the adverse employment actions breaks the chain of causation. Defendant relies of Drwal v. Borough

---

[22]Even if Ms. Felix did not have knowledge of Mr. Smith's allegations of discrimination, the Third Circuit has recognized that a "cat's paw" theory of discrimination is applicable in all types of employment discrimination. See Marcus v. PQ Corp., 458 Fed. Appx. 207, 212 (3d Cir. 2012) (applying cat's paw theory of discrimination in ADEA case and recognizing its applicability to all types of employment discrimination); see also McKenna v. City of Phila., 649 F.3d 171, 173 (3d Cir. 2011) (applying cat's paw theory to retaliation claim). The cat's paw theory "states that an employer is liable for race discrimination when a nonbiased decision-maker is influenced by a biased managerial employee." Staub v. Proctor Hosp., ___ U.S. ___, 131 S. Ct. 1186, 1193-94 (2011). In this case, Ms. Felix was the decision-maker, but in reaching her decision, she considered Postmaster McAdam's suggestion to change Plaintiff's job duties. See Doc. 40 Exh. 12 ¶17.

of West View, 617 F. Supp.2d 397, 417-18 (W.D. Pa. 2009), where the court found that increased scrutiny of the plaintiff's work was a product of his mishandling of paperwork, rather than indicative of a pattern of antagonism after his discrimination complaint. Here, unlike Drwal, where the plaintiff did not dispute that he had mishandled paperwork, Mr. Smith does not concede that he did anything wrong. He maintains that the reason he did not seek assistance from the supervisors in his station was that he believed one of them was responsible for the hidden mail, which it turns out was true. Rather, he sought guidance from an acting supervisor in a sister-postal station and believed that he had been given permission to transfer the mail. See Smith Dep. at 229-34. Under the circumstances, material issues of fact regarding the propriety of Plaintiff's actions preclude judgment on this basis.

### D.    Legitimate Non-Discriminatory Basis

Because Plaintiff has established a prima facie case of both disability discrimination and retaliation, as discussed above, the burden shifts to the employer to establish some legitimate, non-discriminatory basis supporting its employment decision. McDonnell Douglas, 411 U.S. at 802-03. Here, Defendant has asserted that Plaintiff was suspended and his job duties changed in response to his poor judgment in transporting the mail from the North Philadelphia station to the Lindbergh station. See Doc. 40 Exhs. 12 ¶¶ 14, 16; 14 ¶ 18. The change in job duties eliminated his performing collections and required that he work under closer supervision. See Doc. 40 Exh. 14 ¶18. Considering the record evidence, Defendant has met its burden to show a legitimate basis for the job modification.

## E.    Pretext

Finally, the parties disagree whether the record raises a genuine issue of material fact as to pretext.  Under <u>McDonnell Douglas</u>, Defendant having articulated a legitimate, non-discriminatory basis for the employment decision, the burden again shifts to Plaintiff to show that Defendant's stated reason was a pretext for discrimination or retaliation.[23] 411 U.S. at 804-05.  To meet this burden, "Plaintiff must provide evidence casting 'sufficient doubt upon each of the legitimate reasons proffered by defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or allows the factfinder to infer that discrimination was more likely than not a motivating or determinative' basis for the adverse employment action."  <u>Duffy v. Sodexho, Inc.</u>, Civ. No. 05-5428, 2008 WL 4919399, at *6 (E.D. Pa. Nov. 17, 2008) (citing <u>Fuentes v. Perskie</u>, 32 F.3d 759, 759 (3d Cir. 1994)).  It is not enough that the employer's decision may have been wrong or mistaken.  <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005) (citing <u>Fuentes</u>, 32 F.3d at 765).  In other words, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons."  <u>Fuentes</u>, 32 F.3d at 765.

---

[23]Defendant's argument is limited to pretext, whereas it appears that Plaintiff is pursuing a mixed-motive theory, at least with respect to the discrimination claim.  It is unclear which theory he is pursuing in the retaliation claim.  As previously noted, the <u>McDonnell Douglas</u> paradigm applies differently in a mixed-motive case than it does a pretext case because the issue in a mixed-motive case is whether the discrimination played a motivating part in the decision, not whether it was dispositive.  <u>See</u> <u>supra</u> n.20.

25

Defendant argues that the reason proffered for the change in job duties has been consistent, precluding any inference of unlawful motive. <u>See</u> Doc. 50 at 3 n.2. Specifically, Ms. Felix and Mr. McAdams have said that Plaintiff's job duties were changed to address the poor judgment he used in moving the mail to the Lindbergh station on May 27, 2009. <u>See</u> Doc. 40 Exhs. 12 ¶¶ 14-17; 14 ¶¶ 11, 13, 16-18. The job change would eliminate Plaintiff's duty of collections and allow for work in the station under closer supervision. <u>See</u> Doc. 40 Exh. 14 ¶ 18.

Plaintiff offers two counterpoints to Defendant's claim of an uncontested record on the reason for the job modification. First, Plaintiff argues that Defendant also offered a different reason for its decision, namely the need to increase efficiency. <u>See</u> Doc. 46 at 22. After reviewing the current record, I conclude that Plaintiff has misinterpreted Defendant's evidence. Defendant's reason for the change in Plaintiff's job duties in June 2009 has never wavered. However, when asked if Plaintiff's job duties would have changed absent the mail incident, Ms. Felix conceded that they eventually would have changed. <u>See</u> Doc. 40 Exh. 2 at 118. She explained that towards the end of 2009, she concluded that the volume of mail did not justify the number of collection boxes in her territory. Therefore, she reduced the number of employees required to do collections, and as a result, another rehabilitation carrier, Sheila Irving, also received a modified job assignment. <u>See</u> Doc. 40 Exh. 2 at 119-20. Rather than offering an inconsistent reason for modifying Plaintiff's job duties, Ms. Felix merely explained that Plaintiff's job duties would have been revised at a later time based on the economics of the North Philadelphia station.

Plaintiff's second pretext argument is that there was no legitimate basis for Defendant's suggestion that he was unreliable and required more supervision. See Doc. 46 at 22. Here, considering the totality of the evidence, I conclude that Plaintiff has raised a genuine issue of material fact as to the legitimacy of Defendant's stated reason for the adverse employment action. For example, Plaintiff testified that he sought guidance, first from supervisors above those in the North Philadelphia station and then from a sister-station because he suspected that his superiors may have hidden the mail, which in fact turned out to be true. He further testified that he had never been responsible for causing a zero bundle.[24] See Smith Dep. at 229-34, 274-75. His testimony raises a genuine issue as to whether his supervisors had a legitimate basis to question his judgment.

Moreover, considering other evidence in the record, I conclude that the evidence is sufficient to allow a reasonable factfinder to conclude that the proffered reason was pretextual. "Pretext may . . . be inferred from evidence that 'the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer had discriminated against other members of his protected class or other protected categories of persons.'" Parker v. Philadelphia Newspapers, Inc., 322 F. Supp.2d 624, 633 (E.D. Pa. 2004) (quoting Fuentes, 32 F.3d at 765). In addressing the adverse employment action, Plaintiff relied on the testimony of Hector Torres and Kim Marshall,

---

[24]"Zero bundle" is the term used to describe the situation when a company drops a bunch of mail to see how it flows through the postal system. If no piece of mail from a particular collection box gets to its destination, it is called a zero bundle. Smith Dep. at 274-75.

co-workers of Plaintiff's at the North Philadelphia station.  See Doc. 46 at 21.[25]  Both Mr. Torres and Ms. Marshall discussed the adversity the reduced-duty carriers faced under Ms. Felix.  Ms. Marshall testified that she heard Ms. Felix say that she did not like rehabilitation, limited-duty, and light-duty carriers.  Doc. 46-2 at 87.  Mr. Torres was a limited-duty carrier who stated that he felt like he had a "bullseye on [his] back" working under Ms. Felix.  Doc. 46-2 at 94.  Mr. Torres also observed that Ms. Felix treated Sheila Irving and Plaintiff, both rehabilitation carriers, worse than other mail carriers.  Doc. 46-2 at 94-95.  Specifically, Mr. Torres believed Ms. Felix treated them worse because they were not able to case mail due to their injuries.  Doc. 46-2 at 94.

Construed in the light most favorable to Plaintiff, I conclude that there is sufficient evidence from which a reasonable factfinder could conclude that Defendant's proffered explanation for Plaintiff's discipline was pretextual.

An appropriate order follows.

---

[25]Evidence offered in determining the issue of causation may be germane to the consideration of pretext.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) ("nothing requires us to ration evidence between one stage or the other").